IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| BENNINGTON FOODS, L.L.C. d/b/a BENNINGTON GROUP | : : : | CIVIL ACTION |
| v. | : : | |
| ST. CROIX RENAISSANCE GROUP, L.L.L.P. | : : | NO. 06-154 |

MEMORANDUM

Bartle, C.J.                                                December 9, 2009

Plaintiff Bennington Foods, L.L.C., d/b/a Bennington Group ("Bennington Foods LLC") sues St. Croix Renaissance Group L.L.L.P. ("SCRG") in both contract and tort in relation to a dispute between the parties regarding the dismantling of a closed alumina manufacturing plant in St. Croix. Now before the court is the Daubert motion of defendant SCRG to strike the expert reports of Dr. William J. O'Donnell ("Dr. O'Donnell") and Frederick A. Raffa, Ph.D ("Dr. Raffa") pursuant to Rule 702 of the Federal Rules of Evidence.

The facts of this case are detailed at length in our Memorandum dated September 8, 2009. We discuss here only those facts that are particularly relevant to the instant motion. Bennington Foods LLC was hired to dismantle manufacturing equipment and remove all resulting scrap metal from the alumina plant owned by SCRG. Bennington Foods LLC planned to purchase the scrap from SCRG and then resell it for a profit. However, work at the plant was prematurely halted by order of the Virgin

Islands Department of Planning and Natural Resources. As a result, Bennington Foods LLC filed suit against SCRG on November 22, 2006.

Bennington Foods LLC filed its Second Amended Complaint on April 20, 2009. In a Memorandum and Order dated September 8, 2009, this court granted in part and denied in part the parties' cross motions for summary judgment. The only claims remaining are the Count II claims for breach of the Dismantling Contract and the Count IV claims for negligent misrepresentation, except for those which relate to tanks T-30-1 and T-30-2.

To establish damages for these remaining claims, Bennington Foods LLC hired experts to determine the profit it would have realized had the removal and resale of scrap metal proceeded as intended. Bennington Foods LLC employed an engineering expert, Dr. O'Donnell, to inventory the types and weights of scrap metal at the site[1] and an economist, Dr. Raffa, to calculate lost profits.

Dr. O'Donnell, who received his Ph.D. in mechanical engineering from the University of Pittsburgh, has extensive experience in the areas of metallurgy, engineering mechanics, and mechanical design. Dr. O'Donnell employed two strategies to determine the amount of scrap metal which would have been removed by Bennington Foods LLC from the SCRG plant. First, Dr.

---

1. According to Dr. O'Donnell's expert report, he inventoried only that scrap metal which, according to Bennington Foods LLC, was to be removed pursuant to the agreement between Bennington Foods LLC and SCRG.

O'Donnell reviewed a number of documents relating to the metal located at the site. These documents included engineering drawings of various structures on the plant as well as a report by the Globex Corporation ("Globex"), a company that had previously inspected and inventoried scrap metal at the SCRG plant.[2] Second, Dr. O'Donnell, along with a team of engineers, conducted a physical inspection of the plant on June 8 and 9, 2009. In his expert report dated June 30, 2009, Dr. O'Donnell determined that a total of 80,713,857 pounds of scrap metal would have been removed by Bennington Foods LLC from the SCRG alumina plant had the project proceeded as intended.[3]

Dr. Raffa used Dr. O'Donnell's weight determinations to calculate the income Bennington Foods LLC would have realized had it resold the scrap metal as planned. To determine the price per metric ton of each particular type of metal as of the time these sales would have taken place,[4] Dr. Raffa relied on information provided to him by employees of Bennington Foods LLC which those

---

2. Globex was selected to inventory scrap metal at the SCRG plant pursuant to an order by Magistrate Judge Canon on November 13, 2006, in the related case J&S Development Corp., et al v. Montrose Global Assets, Inc., et al., No. 06-0094 (D. St. Croix Nov. 13, 2006) (order that parties retain Globex to conduct investigation). The order required Globex to inventory "the entire site referred to as the 'former Alumina Plant' located at No. 1 Estate Anguilla, Kingshill, St. Croix."

3. This total is based on the following: 78,514,046 pounds carbon steel; 1,347,234 pounds copper; 845,768 pounds stainless steel; and 6,810 pounds aluminum.

4. According to Dr. Raffa's report, Bennington Foods LLC estimated that the project would have begun in May of 2006 and lasted for approximately six months.

employees obtained from records of average prices in the scrap-metal market as reported on the website metalprices.com. After calculating total revenue, Dr. Raffa deducted the costs that Bennington Foods LLC would have incurred in the process of dismantling, purchasing, and shipping the scrap. In his initial report, Dr. Raffa calculated total lost profits of $16,696,139. On October 13, 2009, Dr. Raffa updated his report to reflect new information he received regarding the rates that Bennington Foods LLC would have paid to ship the scrap from St. Croix to Mumbai, India.[5] After accounting for this new information, Dr. Raffa now calculates total lost profits of $15,713,274.

SCRG moves to strike the reports of Dr. O'Donnell and Dr. Raffa on the ground that they fail to meet the standard for admissibility of expert opinion as set forth in Rule 702 of the Federal Rules of Evidence and by the United States Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

Under the Federal Rules of Evidence, a trial court is tasked with acting as a gatekeeper "to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 243 (3d Cir. 2008) (internal quotation marks omitted); <u>Daubert</u>, 509 U.S. at 589. To be admissible, such evidence must satisfy the three

---

5. This updated report is currently the subject of a motion by defendant SCRG to strike the report pursuant to Rule 26 of the Federal Rules of Civil Procedure. We will deal with this motion separately.

major requirements set forth in Rule 702:[6]  (1) the proffered expert must be qualified; (2) the expert must give an opinion "about matters requiring scientific, technical, or specialized knowledge" which is derived from a reliable process or technique; and (3) the expert's testimony must "assist the trier of fact," that is, it must "fit" the facts of the case.  Pineda, 520 F.3d at 244; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994).

To meet the qualification prong, an expert must "possess specialized expertise."  Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  Due to the liberal policy of admissibility illustrated by Rule 702, "a broad range of knowledge, skills, and training qualify an expert."  Paoli, 35 F.3d at 741.  It is sufficient that the proposed expert meets this threshold.  We need not find him or her to be the best qualified or his or her specialization to be the most

---

6. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

appropriate. Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996).

Under the second prong of Rule 702, we must determine whether "the process or technique the expert used in formulating the opinion is reliable." Paoli, 35 F.3d at 742. We consider several factors in making our reliability determination:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, 520 F.3d at 247-48. The focus of this inquiry "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.

Finally, to assist the trier of fact, an expert's testimony must "fit" the facts of the case. As noted by the Court in Daubert, "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." 509 U.S. at 591. Consequently, even otherwise reliable expert knowledge is inadmissible if not relevant to the facts of the instant case. Paoli, 35 F.3d at 743.

The standard for admissibility is a liberal one. As noted by our Court of Appeals, the Federal Rules of Evidence "embody a strong preference for admitting any evidence that may

assist the trier of fact." Pineda, 520 F.3d at 243. Therefore, proponents of expert testimony "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." Paoli, 35 F.3d at 744. Pursuant to this liberal standard, an expert opinion will be admissible so long as it is based on "good grounds." Id. Where such good grounds exist, a trial judge "should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which render's the expert's conclusions incorrect." Id. at 746.

We first consider the expert report of Dr. O'Donnell. SCRG does not challenge Dr. O'Donnell's qualifications. Rather, it contends that Dr. O'Donnell's report lacks sufficient reliability and "fit" to be admitted under Rule 702.

Although SCRG formulates its first argument as an attack on the reliability of Dr. O'Donnell's report, it is actually disputing the accuracy of his conclusions. The thrust of its argument is that the weight determinations in Dr. O'Donnell's report are inaccurate to the extent that they differ from those in the Globex report.[7] This argument misses the mark.

---

7. In his report, Dr. O'Donnell notes instances where his weight determinations differ from those of Globex (as reported by Globex on December 21, 2006 and March 6, 2007). For example, in a section entitled "Copper Inventory" Dr. O'Donnell states that "[t]he copper weight inventoried by Globex included some major approximations and did not include all of the available copper. O'Donnell therefore inventoried and added this missing material."

When evaluating the admissibility of expert opinion evidence, our analysis is not focused on comparing the conclusions of opposing experts, but rather on determining whether a particular expert used reliable methodology in arriving at his conclusions. Daubert, 509 U.S. at 595. Therefore, we examine the process by which Dr. O'Donnell arrived at his weight determinations, not his conclusions.

According to both his report and deposition testimony, Dr. O'Donnell obtained dimensional measurements for the various structures at the SCRG facility by conducting field tests and examining engineering drawings. Using those measurements, he then applied elementary scientific formulae to calculate the weight of each structure. By adding together the weight of all structures at the plant, he was able to determine the total weight of available scrap metal.[8] We need not engage in a protracted discussion of the various Daubert factors to conclude that the use of such fundamental scientific principles is an appropriate means of calculating the weight of physical objects.

---

8. During Dr. O'Donnell's deposition, SCRG asked him to provide mathematical calculations to support his weight determinations. Dr. O'Donnell responded by stating that, although he did not have the exact figures with him at the deposition, the weight of each structure was determined by obtaining dimensional measurements and then using those measurements to calculate weight. For example, when asked how he determined the weight of certain metal tanks, Dr. O'Donnell stated, "[y]ou take the circumference times the thickness times the length. You have the volume. You multiply it by the density of the volume and you have the weight." (O'Donnell Dep. 25:12-15.)

Accordingly, we find that Dr. O'Donnell's opinions are based on reliable methodology.

SCRG further contends that Dr. O'Donnell's report does not "fit" the facts of this case. As discussed by our Court of Appeals in Paoli, the fit prong involves a question of scientific validity. 35 F.3d at 743; see also Daubert, 509 U.S. at 591. What SCRG argues, however, is merely that several portions of Dr. O'Donnell's testimony are irrelevant to this case because he calculated the weight of certain structures which, according to SCRG, are not included in the group of structures that Bennington Foods LLC was to dismantle pursuant to its contract with SCRG (the "Dismantling Contract"). SCRG maintains that, by including these structures in his calculations, Dr. O'Donnell overestimated the total weight of scrap metal, thereby rendering his report inaccurate and incapable of assisting the jury.

SCRG acknowledges in its brief that "there is a dispute between the parties as to what was to be dismantled and scraped [sic]." (Def.'s Br. 9.) This will be a matter for the jury to decide. Because Dr. O'Donnell applied reliable methodologies in determining the types and weights of scrap metal at the SCRG plant, his expert opinions will assist the trier of fact in this case and are therefore admissible. If SCRG disagrees with Dr. O'Donnell's conclusions, it can challenge those conclusions during cross-examination. See Daubert, 509 U.S. at 596; Aetna Inc. v. Express Scripts, Inc., No.07-5541, 2009 WL 2973022, at *11 (E.D. Pa. Sept. 16, 2009).

Next, SCRG requests that we strike the expert report of Dr. Raffa on the grounds that it too is unreliable and does not fit the facts of this case. As with Dr. O'Donnell, SCRG does not challenge Dr. Raffa's qualifications as an expert. Although SCRG purports to challenge the reliability and fit of Dr. Raffa's report, it does not dispute the basic economic methodology used by Dr. Raffa, nor does it claim that such methodology is invalid for the purpose of calculating lost profits in this case. Rather, SCRG simply disputes the underlying data on which Dr. Raffa's economic calculations are based.

Essentially, SCRG argues that Dr. Raffa's report is based on "shaky" factual assumptions. However, as noted above, "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect." Paoli, 35 F.3d at 744. As the Supreme Court has instructed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

Whether Dr. Raffa should have researched further the underlying facts provided to him by Plaintiff "is a question of weight, not admissibility." Floorgraphics, Inc. v. News America Marketing In-Store Services, Inc., 546 F. Supp. 2d 155, 169 (D.N.J. 2008). Dr. Raffa did not engage in "unsupported speculation." See Daubert, 509 U.S. at 590. Rather, he applied his economic expertise to calculate lost profits based on

information that he collected from a variety of sources and on which he reasonably relied. Rule 703 of the Federal Rules of Evidence specifically allows an expert to rely on such information. See Fed. R. Evid. 703; Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002).

Dr. Raffa's metal quantity figures were based on Dr. O'Donnell's report, which, as discussed, we find to be sufficiently reliable. The price numbers used by Dr. Raffa came from Bennington Foods LLC employees who had experience with selling scrap metal. These prices were based on the average price of each type of metal scrap during the relevant period as reported on metalprices.com. The project cost numbers were received from Bennington Foods LLC employees who estimated expenses based on their own prior experience. Finally, in his updated report, Dr. Raffa relied on a shipping expert, Michael Robson, to determine the cost of shipping the scrap metal to India.

This simply is not a case where an expert offers an opinion completely devoid of any factual basis. See Elock v. Kmart Corp., 233 F.3d 734, 754-56 (3d Cir. 2000). The opinions contained in Dr. Raffa's expert report meet the minimum qualifications for admissibility, and, to the extent that SCRG disputes the assumptions on which those opinions are formed, they are free to cross-examine Dr. Raffa at trial. See Polymer Dynamics, 2005 WL 1041197, at *2.

In sum, we find that the opinions of Dr. O'Donnell and Dr. Raffa meet the requirements set forth in Rule 702. Both experts are qualified and both have provided opinions on matters requiring specialized knowledge by applying reliable methodology to the facts of this case. Accordingly, we will deny the motion of SCRG to strike the expert reports of Dr. O'Donnell and Dr. Raffa.