IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

BENNINGTON FOODS, L.L.C. d/b/a : CIVIL ACTION
BENNINGTON GROUP :
:
v. :
:
ST. CROIX RENAISSANCE GROUP, :
L.L.L.P. : NO. 06-154

MEMORANDUM

Bartle, C.J.                                    April 20, 2010

          Plaintiff, Bennington Foods, L.L.C. d/b/a Bennington
Group ("Bennington") sued the defendant, St. Croix Renaissance
Group, L.L.L.P. ("SCRG") for breach of contract.  SCRG filed an
answer with a counterclaim for reformation.  At trial, the court
reformed the contract, and the jury returned a verdict in favor
of SCRG and against Bennington on the breach of contract claim.
Before the court are two motions by Bennington for a new trial
pursuant to Rule 59 of the Federal Rules of Civil Procedure.[1]

I.

          The relevant facts of this case, taken in the light
most favorable to the verdict winner, are as follows.  In June of
2002, SCRG purchased a closed alumina refinery on St. Croix from
Alcoa, Inc.  Since SCRG planned to use the property for purposes
other than alumina refinement, it decided to have dismantled a

_____

1.  We exercise subject matter jurisdiction pursuant to 28 U.S.C.
§ 1332.

number of alumina processing units, storage tanks, and other
structures and to have them removed from the site. To this end,
in 2005, SCRG engaged a scrap metal broker, Arthur Muchnick
("Muchnick"), owner of Montrose Global Assets Inc. ("Montrose").
Muchnick referred SCRG to Bennington, and the three companies
(SCRG, Montrose, and Bennington) began negotiations regarding a
"dismantling project."

     During negotiations, one of Bennington's principals,
Abul Shah, visited the SCRG site along with his two
subcontractors, James Allen ("Allen") of Bradford Welding & Truck
Equipment, Inc. and John DiVincenzo ("DiVincenzo") of J&S
Development, Corp., in order to assess the scope of the project.
They were led through the site by SCRG personnel, who pointed out
which structures were to be removed and which were to remain.
Allen and DiVincenzo formed a company known as Metal Munchers LLC
for the purpose of completing the actual dismantling work, and
they contracted with Bennington, which acted as project manager.
In February, 2006, Bennington submitted a demolition plan which
included a drawing that showed the planned phases of the project
and identified the structures to be removed.

     SCRG, Montrose, and Bennington eventually settled on an
arrangement in which Bennington, through its subcontractors,
would dismantle and remove the structures. Bennington would
purchase the resulting scrap metal from Montrose and SCRG at a
fixed price per ton, and then ship that metal from St. Croix to
India where Bennington hoped to sell it for a profit. This

agreement was memorialized in a series of contracts drafted by the parties, without the assistance of counsel, in March 2006.

The first of those contracts, signed on March 10, governed the relationship between SCRG and Montrose. Montrose would act as a broker to secure a deal with Bennington for the dismantling project, in return for which Montrose was to receive the right to half of the proceeds from the sale to Bennington of the resulting scrap metal. On the same day, Montrose signed an agreement known as the "Sales Contract," which set forth terms for the sale of the scrap metal. This contract was also signed by one of Bennington's principals, Naseem Hameed, but she signed it under the same Bennington Group LLC, not Bennington Foods, L.L.C., the plaintiff in this action.[2]

The "Dismantling Contract," which was the agreement at issue at the trial, was circulated on March 17, 2006 and eventually signed by SCRG, Montrose, Bennington, Allen, and DiVincenzo.[3] It provided an estimated project duration of "+/- Six (6) months" and stated that "mobilization" was expected to commence "[o]n or around April 1, 2006." The Dismantling

---

[2]. Although Bennington Group LLC and Bennington Foods, L.L.C. were operated by the same principals, Abul Shah and Naseem Hameed, they were, in fact, distinct entities. This distinction is discussed at length in our summary judgment memorandum of September 8, 2009. Bennington Foods, L.L.C. v. St. Croix Renaissance Group L.L.L.P., 2009 WL 2950490, at *6-8 (D.V.I. Sept. 8, 2009).

[3]. The Dismantling Contract was signed by Bennington on March 16, Allen and DiVincenzo on March 17, Montrose on March 18, and SCRG on March 21.

Contract also set forth the obligations and responsibilities of
each party with regard to the dismantling project.  Those most
relevant to the instant case are as follows:  (1) SCRG was
responsible for obtaining all necessary permits within a
reasonable time and abating any hazardous waste materials found
on the site, though the contract gave Bennington and its
subcontractors the right to hire a third party for removal of
such waste, upon approval by SCRG; (2) Bennington and its
subcontractors were responsible for actually dismantling and
removing the structures "in accordance with local, state and
federal regulations"; and (3) Montrose was tasked with arranging
the sale of the resulting scrap metal to Bennington, and
collecting payments therefrom.

      The Dismantling Contract also outlined the scope of the
project.  Attached to the Dismantling Contract were four pages
entitled "Partial List of Items to be Dismantled and Removed."
The list identified each structure to be dismantled by number,
for example, T-30-1, and provided the weight and total capacity
of each.  Every page of this list was initialed by all of the
contracting parties.  The contract also designated certain items
as "outside the designated work areas" and not to be removed or
disturbed.  Such items included, among other things, electrical
substations and underground electrical wiring.

      Before the dismantling project could begin, it was
necessary for SCRG to obtain two permits from the United States
Virgin Islands Department of Planning and Natural Resources

("DPNR"): (1) a Costal Zone Management ("CZM") permit, and (2) a demolition permit. SCRG applied for the CZM permit on March 7, 2006, prior to signing the Dismantling Contract. It was anticipated that the demolition permit would issue as a matter of course shortly after SCRG obtained the CZM permit. On March 22, SCRG received from DPNR a list of specific deficiencies in its CZM permit application, which SCRG then made efforts to resolve.

In early April, 2006, with permission from SCRG, Bennington brought its subcontractors to St. Croix to begin "pre-demolition" work. On or about April 26, 2006, an inspector from the DPNR Division of Building Permits witnessed the work being done by Bennington and its subcontractors. He determined that such work did in fact require permits, which had not yet been obtained, and orally advised SCRG that all work was to cease until the necessary permits were acquired. SCRG informed Shah, Allen, and DiVincenzo that they were to stop working.

Bennington was also concerned about the existence of asbestos on the site. Although Alcoa, the previous owner, had told SCRG when SCRG purchased the plant that all asbestos had been removed from the relevant portions of the property, later assessments obtained in May and June of 2006 by SCRG and Bennington's subcontractors confirmed that, in fact, some asbestos remained. Because the Dismantling Contract required SCRG to abate any hazardous waste materials, SCRG solicited a proposal from an asbestos abatement company which included a plan to coordinate the asbestos removal with the dismantling project.

SCRG anticipated this abatement plan would allow the project to continue without delay.

On May 15, DPNR informed SCRG that its CZM permit application was deemed complete and provided a list of areas of concern, which SCRG addressed in preparation for the mandatory public hearing on its application, scheduled for June 26, 2006.

On June 13, 2006, prior to issuance of any permits to SCRG, inspectors for the DPNR Division of Building Permits, the Division of Environmental Enforcement, and the Division of Costal Zone Management visited the plant and saw that additional work had been unlawfully conducted there. Bennington and its subcontractors, believing that the verbal order of April 26 was invalid, had resumed work despite being informed by SCRG that such work, without permits, would violate Virgin Islands law. As a result, DPNR issued a written cease and desist order on June 15, 2006. It mandated that all work be stopped and all equipment and workers be removed from the site, including from the temporary housing which had been constructed to shelter the workers for the duration of the dismantling project. On June 19, pursuant to DPNR's order, SCRG removed all of Bennington's workers and those of its subcontractors.

On June 26, the scheduled public hearing was held on SCRG's CZM permit application.

On July 27, the Virgin Islands Costal Zone Management Commission ("CZM Commission") issued to SCRG, Bennington, and the subcontractors a Notice of Violation, Notice of Assessment of

Civil Penalty, Order for Corrective Action, and Notice of
Opportunity for Hearing ("NOVA").  In this NOVA, the Commission
presented findings of fact that Bennington and its subcontractors
had resumed work on the property without any of the necessary
permits, despite the verbal order of the Department of Building
Permits inspector and the express instructions of SCRG not to
continue with their work.  The CZM Commission directed that the
cease and desist order remain in place and assessed a $10,000
fine against SCRG individually and a $10,000 fine against
Bennington and its subcontractors, J&S Development Corp. and
Bradford Welding & Truck Equipment, Inc., for which the three
companies were jointly and severally liable.  It ordered that no
party was to work at the site without first having the cease and
desist order lifted as to it.

On August 28, 2006, the parties entered an informal
settlement conference with the CZM Commission regarding the cease
and desist order.  On September 5, 2006 SCRG paid the $10,000
fine and, shortly thereafter, received the proposed language for
the final permit.  The CZM permit was signed and given to SCRG on
December 1, 2006, and the cease and desist order was lifted as to
SCRG on December 11, 2006.  Bennington never paid the fine
assessed against it.  Thus, the cease and desist order was never
lifted as to Bennington or its subcontractors.

II.

On November 22, 2006, prior to SCRG's obtaining its CZM
permit, Bennington initiated the instant action by filing a

-7-

complaint in this court alleging, among other things, that SCRG had breached the Dismantling Contract. Bennington's theory of breach was twofold. It alleged that SCRG breached the contract by: (1) failing to obtain all necessary permits within a reasonable time, and (2) failing to abate the asbestos found on the site. Bennington sought to recover expectation damages in the form of lost profits. It calculated its lost profits as the difference between the amount it was to pay SCRG and Montrose for the scrap and the amount for which it would have sold the scrap on the Indian scrap-metal market, less the costs it would have incurred in the process of dismantling, removing, and shipping the scrap.

At the close of the evidence and before the case was submitted to the jury, the court permitted the parties to present arguments to the court, outside the hearing of the jury, regarding SCRG's counterclaim for reformation. SCRG contended that certain tanks were incorrectly included on the "Partial List of Items to be Dismantled and Removed" as a result of the mutual mistake of all parties. The court agreed with SCRG in part and, invoking its equitable power, reformed the Dismantling Contract. Based on evidence presented at trial, we found that of the 116 tanks on the "Partial List," 14 had been included as a result of mutual mistake.[4] The court thereafter instructed the jury that

---

4. In its counterclaim, SCRG contended that 18 tanks were included erroneously on the "Partial List." However, the court determined that 4 of the tanks identified in the counterclaim
(continued...)

those 14 tanks were not to be considered if and when they reached the issue of damages.

The jury was provided four special interrogatories to answer.[5]  The first read:

> Has the plaintiff, Bennington, proven by a
> preponderance of the evidence that St. Croix
> Renaissance Group breached the Dismantling
> Contract by failing to obtain all necessary
> permits within a reasonable time?

_____

4.(...continued)
had, in fact, been included in the scope of items to be dismantled and removed under the agreement between the parties.

5.  The complete set of interrogatory questions provided to the jury was as follows:

1.  Has the plaintiff, Bennington, proven by a preponderance of the evidence that St. Croix Renaissance Group breached the Dismantling Contract by failing to obtain all necessary permits within a reasonable time?

**If you answered "NO" to question 1, proceed no further.  If you answered "YES" to question 1, proceed to questions 2 and 3.**

2.  Has the plaintiff, Bennington, proven by a preponderance of the evidence that it was ready, willing, and able to perform its contractual obligations to dismantle and purchase the scrap metal except for St. Croix Renaissance Group's breach?

3.  Has the defendant, St. Croix Renaissance Group, proven by a preponderance of the evidence that it was prevented from performing its contractual obligations by the actions of Bennington?

**If you answered "NO" to question 2 OR "YES" to question 3, proceed no further.  If you answered "YES" to question 2 AND "NO" to question 3, proceed to question 4.**

4.  What is the amount of damages, if any, that the plaintiff, Bennington, has proven that it suffered as a result of the contractual breach by St. Croix Renaissance Group?

The jury answered "no."  Consequently, they never reached the remaining questions, including the interrogatory related to damages.

On February 23, 2010, Bennington filed its first motion for a new trial under Rule 59 of the Federal Rules of Civil Procedure.  In this motion, Bennington argues that it is entitled to a new trial due to the allegedly erroneous decision by this court to resolve the equitable counterclaim for reformation prior to the jury's deciding the legal claim for breach of contract.

Bennington then filed a second Rule 59 motion for a new trial on February 25, 2010.  In this second motion, Bennington argues that a new trial is warranted because:  (1) it suffered prejudice due to the court's instructing the jury regarding reformation prior to deliberation; (2) it was prejudiced by the court's decision to disallow it from presenting to the jury an alternative theory to support its breach of contract claim; (3) it was prejudiced by a jury instruction that the Dismantling Contract did not include underground wiring in the group of items to be dismantled and removed; (4) it was prejudiced by having to introduce evidence that it was ready, willing, and able to perform its obligations under the Dismantling Contract; (5) it was prejudiced by the court's decision to exclude a certain document from evidence at trial; and (6) the jury's verdict was against the manifest weight of the evidence.

III.

Under Rule 59 of the Federal Rules of Civil procedure, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The decision whether to grant a new trial is within the discretion of the trial court, and the standard used to guide that decision varies depending on the ground upon which the motion rests. See Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980); Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993).

Where a new trial is requested due to alleged legal errors by the court, we have broad discretion to decide the motion. When doing so, we engage in a two-part inquiry: (1) whether an error was committed and (2) if error is found, "whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600, 601 (E.D. Pa. 1989), aff'd, 922 F.2d 184 (3d Cir. 1990); Adams v. Ford Motor Co., 2008 WL 3925222, at *1 (D.V.I. Aug. 20, 2008) (internal quotation marks omitted).

Alternatively, the court may grant a new trial where the jury's verdict is against the weight of the evidence such that "'a miscarriage of justice would result if the verdict were to stand'" or where the verdict is "'so unreasonable as to offend the conscience of the court.'" Thomas Hyll Funeral Home, Inc. v. Bradford, 233 F. Supp. 2d 704, 708-09 (D.V.I. App. Div. 2002)

(quoting Dunn v. HOVIC, 1 F.3d 1362, 1364 (3d Cir. 1993); Murray v. Fairbanks Morse, 610 F.2d 149, 152 (3d Cir. 1979)).

We begin with Bennington's motion regarding the court's judgment on the issue of reformation. A court may reform a contract where clear and convincing evidence shows that, because of mutual mistake by all parties, the contract does not accurately reflect the agreement that the parties intended it should. See Restatement (Second) of Contracts § 155 (1981); Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co., 988 F.2d 386, 404 (3d Cir. 1993). Because a claim for reformation is an equitable one, the right to a jury trial under the Seventh Amendment does not apply. See Granfinanciera v. Nordberg, 492 U.S. 33, 41-42 (1989); Giant Eagle, Inc v. Federal Ins. Co., 884 F. Supp. 979, 985 (W.D. Pa. 1995); Richard A. Lord, 27 Williston on Contracts § 70:15, at 244 (4th ed. 2003). It is for the court, not the jury, to decide whether to reform a contract. Giant Eagle, 884 F. Supp. at 985.

As noted above, after considering all relevant evidence presented at trial, the court found that the "Partial List of Items to be Dismantled and Removed" did not accurately reflect the agreement of the parties, and that certain tanks were included on that list as a result of mutual mistake. Once the court made this determination, it became necessary to advise the jury of the scope of the Dismantling Contract as reformed. An accurate list of the structures to be removed according to the reformed Dismantling Contract would have been vital for any

damages calculation by the jury had it found SCRG liable for breach.  Accordingly, the court instructed the jury as follows:

> You have heard testimony and have seen documents about whether the parties were mistaken or not mistaken when they included for dismantling certain tanks listed in the written contract, Exhibit 74.  This part of the case has been resolved so that you must disregard all of that evidence relating to mistake. You are absolutely bound to do that. I instruct you as a matter of law that Tanks No. T-3D-12, T-11-1, T-26-1, and T-10-3 are part of the contract and should be included in any damage calculation, while Tanks No. T-10-1, T-17-1, T-17-2, T-17-5, T-30-1, T-30-2, T-30-3, T-20-13, T-12-1, T-12-2, T-12-3, T-12-4, T-12-5, and T-26-2 are no longer in the contract and should not be considered by you in any damage calculation.

Bennington does not challenge the court's reformation finding on the merits.  Rather, it argues that, by deciding the equitable claim for contract reformation before sending the legal claims of breach and damages to the jury, it was effectively denied its Seventh Amendment right to a jury trial on factual issues common to both the legal and equitable claims.  To support its argument, Bennington cites <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500 (1959); <u>Lytle v. Household Mfg., Inc.</u>, 494 U.S. 545 (1990); and <u>AstenJohnson, Inc. v. Columbia Cas. Co.</u>, 562 F.3d 213 (3d Cir. 2009).

It is important to emphasize at the outset that the court's decision to reform the Dismantling Contract and to instruct the jury accordingly did not affect the outcome of this action.  The court simply reformed the contract to eliminate 14 out of the 116 tanks for dismantling on the ground that those 14

had been included by mutual mistake.  Whether or not all or only some of the tanks were slated for demolition was completely irrelevant to the issue of whether SCRG breached the Dismantling Contract by failing to obtain all necessary permits within a reasonable time.  As explained above, the jury found, by answering "no" to the first special interrogatory, that SCRG had not breached the Dismantling Contract.  As the jury did not find a breach by SCRG, it never considered the issue of damages, which was the only issue to which reformation had any relevance.  The court's reformation of the Dismantling Contract simply did not abrogate Bennington's right to a jury trial.

The cases cited by Bennington are inapposite.  <u>Beacon Theatres</u>, an antitrust dispute between competing movie theatre operators, involved a claim for declaratory judgment by Fox West Coast Theatres, Inc. ("Fox") that it was not violating the antitrust laws and a counterclaim by Beacon Theatres, Inc. ("Beacon") that it was.  359 U.S. at 502-03.  As such, the complaint and the counterclaim raised the same issues of fact regarding Fox's alleged antitrust violations.  The district court, having decided that the complaint sounded in equity, denied Beacon's request for a jury trial.  <u>Id.</u> at 503.  The Supreme Court found this decision to be erroneous.  It reasoned that when both legal and equitable claims are brought in the same action and there are common issues of fact between the two claims such that a court's resolution of an issue would foreclose relitigation of that issue before a jury by res judicata or

collateral estoppel, the legal claims must be tried first to ensure that the right to a jury trial of legal issues is not "lost." Id. at 510-11.

In Lytle, an employee brought claims against his employer under both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. 494 U.S. at 545. These claims raised identical issues of fact. Under § 1981 the plaintiff was entitled to a jury trial, but not with respect to his Title VII claims. The district court erroneously dismissed Lytle's § 1981 claims and held a non-jury trial on his Title VII claims. Id. The Supreme Court, applying the rule of Beacon Theatres, vacated the decision of the district court with regard to the Title VII claims. Id. at 556. It reasoned that had the district court not erroneously dismissed Lytle's § 1981 claims a jury would have been required to resolve the factual issues presented by those claims before the court could decide the Title VII claims. Id. at 551-52, 555.

Finally, in AstenJohnson, the plaintiff, a manufacturer of asbestos dryer felts, sued for a declaratory judgment that defendants, its insurers, were contractually obligated to provide liability coverage for asbestos-related injuries. 562 F.3d at 216. Defendants filed a counterclaim for reformation. The plaintiff's declaratory judgment claim and the counterclaim for reformation were both premised on an identical factual question regarding the interpretation of an ambiguous provision in the plaintiff's insurance policy. The district court held a nonjury

trial and found in favor of the defendants on both the claim for declaratory judgment and the counterclaim for reformation. The Court of Appeals for the Third Circuit reversed. It held that the declaratory judgment claim was legal in nature and therefore required a trial by jury. Id. at 226. Applying the rule of Beacon Theatres, the court further determined that, because the equitable counterclaim for reformation turned on the interpretation of the same ambiguous contractual language as did the legal claim for declaratory judgment, such interpretation being an issue to be resolved by the trier of fact, the plaintiff was entitled upon remand to have the jury resolve the question first. Id. at 228.

The instant case differs from those cited by Bennington in that, here, there were no common issues of fact underlying the equitable issue of reformation and the legal issue of breach of contract.[6] Accordingly, the court's ruling on the equitable counterclaim for reformation prior to the jury's resolution of the legal claim for breach did not violate the rule set forth in Beacon Theatres and its progeny. The jury decided the legal

---

6. In its brief, Bennington seems to suggest that the court's decision on reformation trespassed on the jury's role as fact-finder because reformation of the Dismantling Contract reduced the number of tanks on the "Partial List of Items to be Dismantled and Removed" and consequently would have had an impact on the amount of damages recovered by Bennington had the jury found a breach. This is incorrect. The jury's role in calculating damages, had it reached the issue, would have been to determine the amount of damages to which Bennington was entitled under the terms of the Dismantling Contract. This is a separate issue from what the terms of that contract actually were, which was the issue properly addressed by the court on reformation.

issue in question without any interference from the court's decision on the equitable issue.

Bennington further argues that, by reforming the contract to exclude certain items which were mistakenly included in the "Partial List of Items to be Dismantled and Removed," the court effectively rejected the testimony of Bennington's witnesses and tainted the credibility of Bennington's entire case in the eyes of the jury. We reject this argument. The court provided a neutral statement that the matter of mistake had been resolved and that the jury was bound to disregard all evidence related to that issue when arriving at a verdict. Further undermining Bennington's position is the fact that the court refused to read out of the Dismantling Contract four of the tanks that SCRG sought to exclude. We see no error in giving this instruction.

Next we consider Bennington's contention that a new trial is warranted due to the court's refusal to allow Bennington to present an alternative theory to the jury in support of its breach of contract claim. As previously noted, the breach of contract claim in Bennington's Second Amended Complaint was premised on two different theories: (1) SCRG failed to obtain all necessary permits within a reasonable time, and (2) SCRG failed to remove all hazardous waste, specifically asbestos, from the site. This court rejected SCRG's summary judgment motion to dismiss these claims. However, after the legal and factual issues were narrowed as the case moved toward trial, it became

clear that Bennington's second theory for breach could not be tried to the jury because SCRG's alleged failure timely to abate asbestos could not, in and of itself, amount to a breach of the Dismantling Contract, aside from any connection the presence of asbestos may have had on SCRG's failure to obtain permits within a reasonable time.

As is evident from the following provisions, the Dismantling Contract clearly anticipated the presence of hazardous material on the site:

> **Hazardous Waste Material Handling and Disposal**
>
> [SCRG] will be solely responsible for the dismantling and disposal of any hazardous waste material or other hazardous material related to scrap dismantling on-site.  In the event that such waste is discovered by [Bennington] along with [its] contractor/ subcontractor, the requisite work required to remove such material will be completed by [SCRG] or through a third party, or alternately, [Bennington] along with [its] contractor/subcontractor may employ the services of a suitable and licensed third party upon written confirmation from [SCRG]. All expenses pertaining to such removal of hazardous waste, including any dismantling required, will be paid by [SCRG].  (emphasis added).
>
> ...
>
> Special Condition:  As referenced under "Hazardous Waste Material Handling and Disposal", the removal of any material classified as hazardous as per EPA and OSHA regulations, for which special handling is required, will be the responsibility of [SCRG].  Such material will be removed in a timely manner which does not delay the overall projected schedule of [Bennington] along with [its] contractor/subcontractor.

> All reasonable additional expenses incurred
> by [Bennington] along with [its] contractor/
> subcontractor as a result of any delay in the
> handling and removal of hazardous materials
> will be reimbursed to [Bennington] or [its]
> contractor/subcontractor by [SCRG]. (second
> emphasis added).

Not only does the contract unambiguously account for the possibility that hazardous materials such as asbestos would be found on the site, it also gives Bennington and its subcontractors the option to remove such asbestos once found. Thus, the mere fact that asbestos was discovered cannot support a claim for breach of contract against SCRG.

The contract also anticipated that removal of hazardous materials, such as asbestos, could delay the project and cause Bennington or its subcontracts to incur additional costs. Therefore, delay alone cannot support a claim for breach of contract. Instead, the contract specifically set forth a "Special Condition" pursuant to which Bennington could be compensated for "delay in the handling and removal of hazardous materials." However, Bennington did not seek reimbursement from SCRG of costs incurred due to project delay, as provided for by the "Special Condition." Rather, it sued to recover expectation damages, that is, the profits it would allegedly have received had the dismantling project been completed. This was confirmed in the joint final pre-trial order filed on January 7, 2010. In the "Statement of Damages" section of that document, Bennington relied on the opinion of its economic expert, Dr. Frederick

Raffa, who opined about Bennington's lost profits but said nothing regarding the cost of removing asbestos.

Nevertheless, the court did permit Bennington to introduce evidence regarding the presence of asbestos and to argue that its presence was a cause in the alleged failure of SCRG to obtain all necessary permits within a reasonable time. Thus, the jury was fully apprised about the existence of asbestos at the site where dismantling was to take place. In finding no breach by SCRG, the jury rejected the notion that the presence of asbestos caused an unreasonable delay in the obtaining of the permits.

Next, Bennington argues that the court erred in reading the Dismantling Contract as excluding underground substations and electrical wiring from the group of items to be dismantled and removed from the site and that Bennington was prejudiced by the court's instructing the jury regarding this determination.[7]

The court concluded that the language of the Dismantling Contract was unambiguous. Thus, the interpretation of the contract was a matter of law for the court. See Restatement (Second) of Contracts § 212(2) & cmt. d; Tamarind Resort Assocs. v. Gov't of the Virgin Islands, 138 F.3d 107, 110-11 (3d Cir. 1998).

---

7. The issue of electrical wiring was particularly contentious at trial because the copper used in the underground wiring and the wire in the electrical substations was the most valuable metal at the site and therefore constituted a large portion of the total lost-profit damages sought by Bennington.

Under the "Dismantlement and Removal Requirements" section, the Dismantling Contract contained the following provisions:

> Certain items outside the designated work areas are not to be disturbed by [Bennington] along with [its] contractor/ subcontractor unless prior written damage to these items (sic). <u>Electrical substations located in the designated work areas will remain</u>. (emphasis added).
>
> ...
>
> In addition, the underground piping and other utilities (<u>i.e. electrical</u>) are not to be disturbed without prior written permission provided by SCRG. (emphasis added).

By providing that electrical substations "will remain" and underground electrical utilities "are not to be disturbed," the Dismantling Contract clearly meant that these items were not to be dismantled or removed. The court instructed the jury accordingly.

The court also recognized there was evidence that these "Dismantlement and Removal Requirements" were waived. Bennington offered evidence at trial that, despite the above contractual provisions, SCRG expressly permitted Bennington to dismantle and remove certain electrical substations and underground electrical wiring. The court instructed the jury as follows:

> The written contract prohibited removal of any underground wire and wire within the electrical substations. However, if you find that Bennington has proven, by a preponderance of the evidence, that, at some point in time after the signing of the written contract, St. Croix Renaissance Group agreed to allow Bennington to dismantle and

remove copper wiring excluded from the
written contract, or otherwise allowed such
copper wiring to be dismantled or removed,
the weight of that copper wire should be
included in your damage calculations.

In sum, the court instructed the jury as to the plain
meaning of the contract while still allowing it to consider
Bennington's evidence regarding SCRG's waiver of the restrictions
on electrical substations and underground wiring.  Bennington's
argument that error occurred is without merit.

We also reject Bennington's argument that, by giving
this instruction, the court signaled to the jury that
Bennington's evidence was not credible.  To the contrary, the
court left open the question of whether SCRG waived the
contractual restrictions by permitting Bennington to remove
underground wires, and, therefore, the jury was still free to
believe Bennington's witnesses who stated that, through
communications with SCRG personnel, they were led to believe that
certain electrical wiring located underground and in the
substations was to be removed during the dismantling project.

Bennington further contends that the court erred in
placing upon it the burden to prove that it was ready, willing,
and able to perform its obligations under the Dismantling
Contract absent SCRG's alleged breach.  We note first that the
jury, by finding that SCRG did not breach the Dismantling
Contract, never reached this issue.[8]  However, Bennington

---

8.  The issue of Bennington's being ready, willing, and able to
                                            (continued...)

suggests that it was prejudiced nonetheless simply because it was required to offer evidence that its employees and subcontractors were qualified and equipped adequately to complete the dismantling project.  We disagree.

The Virgin Islands Code provides that, in the absence of local laws to the contrary, the common law, as expressed in the Restatements, governs.  1 V.I.C. § 4.  Section 244 of The Restatement (Second) of Contracts provides that "[a] party's duty to pay damages for total breach by non-performance is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise." Restatement (Second) of Contracts § 244.  Similarly, § 254 provides that "[a] party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise." Id. at § 254.  Accordingly, whether the breach is classified as nonperformance or repudiation, the non-breaching party must have been capable of performing absent the breach in order to recover damages.

As set forth in Williston on Contracts:

> the party claiming that an anticipatory
> repudiation has excused the performance of a
> condition precedent must show that but for
> the repudiation, he or she would have been
> ready, willing, and able to perform his or

8.(...continued)
perform was in the second special interrogatory, and, because the
jury reached its verdict on the first, it never considered that
issue.

> her obligations under the contract, at least
> where the defendant–that is, the repudiating
> party–places in issue the ability of the
> plaintiff to perform.

Richard A. Lord, 13 Williston on Contracts § 39.41, at 692-93
(4th ed. 2000) (emphasis added).  The non-breaching party need
not tender performance to establish this willingness, but rather
"need only show that before the repudiation, he or she was ready,
willing and able to perform, and would have rendered that
performance had the other party not repudiated."  Id. at 695
(emphasis added).  Finally, with respect to the availability of
damages for the non-breaching party, "where the parties are to
exchange performances under a bilateral contract, while an
anticipatory repudiation generally releases the nonbreaching
party from any duty to perform, the repudiation does not relieve
the nonbreaching party from showing an ability to perform in
order to obtain a remedy."  Id. (emphasis added).

    In Point Prods. A.G. v. Sony Music Entm't, Inc., the
United States District Court for the Southern District of New
York recognized the "maxim of contract law that a party's duty to
pay damages is discharged if it appears that the other party
would have been totally unable to perform its obligations under
the contract."  215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) (citing
Record Club of Am., Inc. v. United Artists Records, Inc., 890
F.2d 1264, 1275 (2d Cir. 1989)).  In Scholle v. Cuban-Venezuelan
Oil Voting Trust, the Court of Appeals for the Second Circuit
explained that "[t]he party wronged must show ... that the breach

caused his loss.  To do this he must prove that he intended to and was able to perform when his performance was due." 285 F.2d 318, 320 (2d Cir. 1960).

Here, Bennington presented evidence that, absent SCRG's alleged breach, it would have dismantled, purchased, and sold the scrap metal in India at a profit.  SCRG argued that, even if it had obtained all the permits, Bennington would not have been able actually to dismantle and sell the metal.  As the above-cited law makes clear, Bennington could not be awarded lost profits damages if it never would have been capable of earning those alleged profits had the contract been performed.  Accordingly, the court instructed the jury as follows:

> Not every breach of contract by St. Croix Renaissance Group entitles Bennington to damages.  Even if St. Croix Renaissance Group breached its contract by failing to obtain all necessary permits in a reasonable time, Bennington is not entitled to damages unless it can prove by a preponderance of the evidence that it was ready, willing, and able to perform its contractual obligations, that is, that it was ready, willing, and able to dismantle, remove, and purchase the scrap metal except for the breach by St. Croix Renaissance Group.  If you find that Bennington has failed to prove that it was ready, willing, and able to do so, you must find in favor of St. Croix Renaissance Group and against Bennington.

This instruction simply informed the jury that, as an element of its breach of contract claim, Bennington was required to prove by a preponderance of the evidence that any damages suffered were actually caused by the alleged breach.  See Pourzal v. Marriott Int'l, Inc., 2006 U.S. Dist. LEXIS 60230, at *4-5

(D.V.I. Aug. 21, 2006); <u>Scholle</u>, 285 F.2d at 320. This
instruction is in conformance with law.

Next, Bennington asserts that it was prejudiced by the
court's excluding the "Sales Contract" from evidence while
allowing SCRG to introduce a draft amendment to that contract.
As mentioned above, the "Sales Contract" was a document created
around the same time as the Dismantling Contract, but which was
signed neither by Bennington Foods, L.L.C. nor SCRG. Rather, the
contract was signed by Bennington <u>Group</u>, LLC, a separate entity.
As it was not signed by either party to this litigation, the
document had minimal relevance to the instant dispute, and its
introduction would have likely confused the jury, especially in
light of the similarity between the names of the two Bennington
companies. The court properly exercised its discretion to
exclude the document. <u>See</u> Fed. R. Evid. 403.

The court did allow introduction of a proposed
amendment to the Sales Contract which was drafted by Bennington's
principals, Abul Shah and Naseem Hameed, and attached to a fax
sent from Bennington to Muchnick. This document described
Bennington's understanding of the scope of the dismantling
project. Specifically, the proposal identified the structures
that Bennington considered to be within the group of items to be
dismantled and removed from the site. The structures identified
by Bennington for removal in the draft amendment differed from
those included on the "Partial List of Items to be Dismantled and
Removed" in the Dismantling Contract. This document was

particularly relevant to the issue of whether certain items were
included on the "Partial List" due to mutual mistake of all
parties. Accordingly, the court permitted SCRG to introduce this
document for the limited purpose of establishing Bennington's
understanding of the items to be dismantled and removed. We see
no error here.

Finally, Bennington contends that the jury's verdict
was against the manifest weight of the evidence. Again, at the
close of trial, the jury decided this case by answering "no" to
the first of the special interrogatories, which read:

> Has the plaintiff, Bennington, proven by a
> preponderance of the evidence that St. Croix
> Renaissance Group breached the Dismantling
> Contract by failing to obtain all necessary
> permits within a reasonable time?

As noted above, a motion for a new trial on the basis that the
jury's verdict was against the weight of the evidence is to be
granted only where "'the record shows that the jury's verdict
resulted in a miscarriage of justice or where the verdict, on the
record, cries out to be overturned or shocks our conscience.'"
V.I. Mar. Serv., Inc. v. P.R. Mar. Shipping Auth., 978 F. Supp.
637, 647 (D.V.I. 1997) (quoting Williamson v. Consol. Rail Corp.,
926 F.2d 1344, 1349 (3d Cir. 1991)).

According to Bennington, the Dismantling Contract
required that the entire dismantling project be completed within
six months from the date the Dismantling Contract was signed.[9]

_____

9. The Dismantling Contract was signed by five different parties
(continued...)

Bennington asserts that "the evidence was overwhelming that SCRG ... could never have obtained the permits such that the Bennington Group could have completed the job within six months of signing the contract," and the jury's verdict was therefore contrary to the weight of the evidence.  We disagree.

The Dismantling Contract contained no specific deadlines by which SCRG was to have obtained all necessary permits.  Nor did it set a specific deadline for project completion.  The relevant provisions are as follows:

> **2.0 DURATION**
> +/- Six (6) months as projected by Bennington Group and their Project Manager along with their contractor/subcontractor.
>
> **3.0 MOBILIZATION**
> On or around April 1, 2006.
>
> **4.0 RESPONSIBILITIES**
> Once work begins it will continue on schedule till completion.

As is evident from reading these provisions, it is unclear whether the Dismantling Contract set a deadline for completion, or, if it did, what that deadline was.  By giving an expected project duration of "+/- Six (6) months," it not only fails to set a firm schedule, it also fails to specify when the "+/- Six (6) months" is to begin.  Contrary to Bennington's assertion, nowhere does the contract state that this "+/- Six (6) months" was to begin when the contract was signed, which, again,

---

9.(...continued)
on four separate days during March of 2006.  Bennington does not specify which of these dates, in its view, is the starting date for the alleged six-month time line.

occurred on multiple dates.  At trial, SCRG maintained that, if
the "+/- Six (6) months" were to be construed as a deadline, it
did not begin to run until mobilization by Bennington and its
subcontractors had been completed.  The contract does not define
"mobilization."  It merely notes that "mobilization" is to occur
"[o]n or around April 1, 2006."  The parties presented
conflicting evidence at trial regarding the meaning of the term
"mobilization" and whether or not it had ever occurred.  Finally,
the contract's statement that "[o]nce work begins it will
continue on schedule till completion" provides no further clarity
because the contract does not explain when "work" is to begin nor
what "schedule" is to be followed.

Ultimately, Bennington's theory of breach at trial was
not that SCRG failed to adhere to some particular deadline for
project completion.  Rather, Bennington based its case on the
theory that SCRG breached the Dismantling Contract by failing to
obtain all necessary permits within a reasonable time under the
circumstances.[10]  It was for the jury to determine what
constituted a "reasonable time" for obtaining the permits.  See
Restatement (Second) of Contracts § 212(2) & cmt. e.  Although
Bennington believes that a "reasonable time" under the
circumstances meant that SCRG was to obtain the permits by such a

---

10.  Because the Dismantling Contract did not specify a deadline
by which SCRG was to have obtained all necessary permits, the
court supplied the omitted term and instructed the jury that such
permits were to be obtained within a reasonable time under all of
the circumstances.  See Restatement (Second) Contracts § 204 cmt.
d (1981).

time as to allow Bennington to complete the entire project within six months from signing the Dismantling Contract, that is certainly not the only reasonable contractual interpretation.

Moreover, SCRG presented evidence suggesting that it attempted in good faith to acquire all necessary permits as fast as the permitting process would allow. According to SCRG, this process was itself an inherently protracted endeavor. In addition, SCRG presented evidence that any delay in its obtaining the permits, beyond that inherent in the permitting process, was the fault of Bennington in disobeying the oral stop-work order of April 26, 2006, and therefore SCRG's failure to acquire the permits more quickly was not unreasonable under the circumstances. SCRG also maintained that, even if the jury were to determine that SCRG had an obligation to obtain all permits within six months from the date of projected mobilization, such mobilization by Bennington was never completed and any six-month duration could therefore not have elapsed.

The evidence presented by SCRG was sufficient to support the jury's finding that SCRG did not breach the Dismantling Contract by failing to obtain all necessary permits within a reasonable time. The jury's verdict in favor of SCRG and against Bennington does not shock the conscience of the court.

Accordingly, the motions of Bennington for a new trial under Rule 59 of the Federal Rules of Civil Procedure will be denied.